JOHNSON, Judge.
The plaintiffs, Mr. and Mrs. James L. McNeil, Jr., hereinafter called McNeil, sued LeRoy Roell, hereinafter called Roell, and Travel Lodge Corporation, hereinafter called Travel Lodge, for $5,000.00, money advanced to Roell by plaintiff. There was judgment in the Civil District Court for the Parish of Orleans for plaintiff against Roell and for defendant Travel Lodge dismissing plaintiffs’ suit as to that corporation. Defendant Roell has appealed from that judgment.
McNeil was interested in going into the motel business and answered an advertisement in a New Orleans newspaper by writing on October 4, 1963, to Travel Lodge, a motel operator, at their regional office at Jackson, Mississippi. By its letter of October 8, 1963, Travel Lodge sent McNeil a questionnaire to fill out. Instead of mailing the information, McNeil made an appointment by telephone with Mr. White of Travel Lodge and went to Jackson to confer with him on the day of the appointment. After waiting a few hours for Mr. White to come into his office, the receptionist in the outer office informed McNeil that he had been in an automobile accident that morning and had gone to the hospital but would be there at 2:00 o’clock p.m. McNeil left the office to return at 2:00 p. m. In the meantime Roell telephoned the McNeils and told them that he was Mr. White’s assistant and would explain whatever they wanted to know. They returned to the Travel Lodge office and talked to Roell, who stated that if McNeil would secure property for a motel, Travel Lodge would be glad to look it over. McNeil came back to New Orleans and found property on Tulane Avenue and took an option on it. He advised Roell, who came to New Orleans to inspect the property. *544 Roell said he was representing Travel Lodge because Mr. White was moving to California. Then in April, 1964, Mr. White and Roell came to New Orleans together to discuss a plan whereby McNeil would build a motel and Travel Lodge would lease it. Following that, McNeil discussed it with two or three building and loan associations in New Orleans and said he had assurance from more than one building and loan association that he could borrow the money for that purpose. On August 3, 1964, Roell came to New Orleans with two prepared documents, one was entitled: “AGREEMENT TO PAY” which obligated McNeil to pay Roell $24,-000 as a fee “for services rendered” and the other was an offer by Travel Lodge to McNeil to lease the motel at a stipulated price, which document was entitled: “OFFER TO LEASE.”
The first document is as follows:
“AGREEMENT TO PAY
“We, James Lewis McNeil and Yvonne Dileo McNeil, do hereby agree to pay Le Roy Roell for services rendered in connection with the leasing of said properties to the TraveLodge Corporation of El Cajon, California the sum of $24,000.00 payable as follows: $10,000.00 when Offer to Lease is signed and note for $14,000.00 bearing interest at 6% when lease- is signed by owners, and put in escrow. Same to be due when TraveLodge makes first rent payable to owners. We further agree to pay at the same rate per unit for any future additions.
“This property is situated in New Orleans, Louisiana, known as:
“Tulane Street property between Broad and Dorgenois Streets.
being approximately 15,000 Square feet.
By /s/ James L. McNeil Jr
JAMES LEWIS MCNEIL
/s/ Yvonne Dileo McNeil
YVONNE DILEO MCNEIL
DATE -
“APPROVED:
/s/ Le Roy Roell
LE ROY ROELL”
The second document is as follows:
“OFFER TO LEASE
“TO: James Lewis McNeil
and
Yvonne Dileo McNeil 4209 Hollygrove New Orleans, Louisiana
“The TraveLodge Corporation of El Ca-jon, California, hereby makes you the following offer to lease that certain parcel of land and improvements situated in Parish of Orleans, New Orleans, Louisiana, Known as
“Tulane Avenue property lying between Broad Street and Dorgenois Street.
being approximately 15,000 square feet.
“The lease on said property is to be for a term of 25 years, at a rental of 1825.00 per month, net to owner. All other expenses whatsoever, taxes, insurance, etc., are to be paid by the tenant, this offer will include two consecutive 10-year options.
“The McNeils proposes to build 60 unit motor-hotel on said property in accordance with plans and specifications tp be prepared by us and mutually approved by both owner and tenant.
“In addition to the $1825.00 per month rent, net, we will pay you on extra rent which shall be 27j¿% of all gross income from said property over the sum of $79,-636.36 per annum.
“This offer to lease is subject to The TraveLodge Corporation being able to get a permit for installing a standard Trave-Lodge sign of not less than 200 square feet in area.
“The terms of the lease are to be in accordance with the sample documents mu *545 tually agreed upon or as revised in accordance with our conversation of this date.
“The TraveLodge Corporation further agrees to deposit the sum of $3650.00 which amount is to include the payment due on the first two months of the lease.
“This Offer is for acceptance within 30 days from date.
THE TRAVELODGE CORPORATION BY-DATE-
“We agree to lease the above property on the terms and conditions herein stated.
/s/ James L. McNeil Jr
James Lewis McNeil
/s/ Yvonne Dileo McNeil
Yvonne Dileo McNeil
“Approved: DATE_
/s/ Le Roy Roell
LE ROY ROELL”
The documents are not dated, but it was proven that they were signed by McNeil on August 3, 1964. On that occasion, after Roell had obtained the signatures of Mr. and Mrs. McNeil to both documents, Roell suggested that it would be better and helpful if McNeil would give him a check for $5,000.00 and another check for $5,000.00 payable to Travel Lodge to show good faith on the part of McNeil. As to this suggestion McNeil called to Roell’s attention that Travel Lodge should sign the offer to lease first but Roell said that Travel Lodge would not sign anything until McNeil had signed and that Travel Lodge would not be interested in anything without McNeil’s signature on it. With that understanding, McNeil gave Roell two checks — one payable to him for $5,000.00 and one payable to Travel Lodge for $5,000.00. It was understood that Roell would take the “Offer to Lease” to be signed by Travel Lodge and return it to McNeil. McNeil testified that he knew he did not owe either party anything at that stage but on Roell’s assurance that these payments would be as a show of good faith on McNeil’s part he acceded to Roell’s request.
After waiting 30 days without hearing anything from anybody McNeil tried to call Roell but could not get in touch with him for about a month. When Roell did answer a call he told McNeil that Travel Lodge decided not to go through with the deal with McNeil building the motel and leasing it to Travel Lodge. He said they wanted to change the plan to a partnership arrangement whereby Travel Lodge and McNeil would own the building with a lease to Travel Lodge on the ground. McNeil advised Roell that he could get the money to build the building himself but thought it would be difficult to make a loan under the new arrangement. Roell came to New Orleans and Mr. McNeil testified that Mrs. McNeil and Roell drafted a document which Roell said outlined a plan that Travel Lodge would approve. The partnership plan would require McNeil to borrow less money than the original arrangement.
We note here that we have read that document, which was offered in evidence. We find it vague and involved and we cannot gain from it any definite understanding of what it proposes.
The McNeils and Roell went together to the National Bank of Commerce and presented the matter with an application-for a loan to McNeil in accordance with the plan. Soon after that Roell went to California he said to attend a meeting of the Board of Directors of Travel Lodge. The bank turned down the application for the loan and McNeil called Roell in California to advise him of it. Roell made it appear that he could not understand why the bank would not make the loan and said he would try to find the money himself for McNeil. After about a month, having *546 heard nothing from Roell, McNeil called him and told him that after further effort McNeil could not make the loan under the new arrangement and had decided to drop the matter. He then requested Roell to return the $5,000.00 check which had been given him. After some delay and many attempts to contact Roell, McNeil finally reached him and demanded the money. Roell said he would like to keep the money for a little time to get his interest on a deposit but would be glad to return it a little later. He never did. Roell does not deny this testimony of McNeil.
On cross-examination counsel for defendants questioned McNeil at length on the proposition that McNeil was to pay Travel Lodge so much per unit to manage the motel under the partnership arrangement. McNeil explained that such a payment was not in the original plan whereby McNeil was to build the motel and lease it to Travel Lodge and such a payment had nothing to do with the “Offer to Lease” which he understood Travel Lodge would make by signing the document which McNeil had already signed at Roell’s request on August 3, 1964. When the payment of the $5,000.00 good faith money to Travel Lodge was made no arrangement had been discussed whereby McNeil would owe Travel Lodge anything at any time. When McNeil withdrew from further effort to make a deal, Travel Lodge had never put their check through the bank and McNeil stopped payment on it. As a matter of fact, according to Roell’s testimony, he did not deliver the check to Travel Lodge until December, 1964. When Travel Lodge did deposit the check it was returned by the bank and Travel Lodge sent it to McNeil without any explanation.
Roell would have us believe that McNeil owed him $10,000.00 the moment McNeil signed the “Offer to Lease,” though it had not been signed by Travel Lodge to effect the offer. Apparently Roell made it appear that Travel Lodge would definitely sign the “Offer to Lease.” In fact at that time McNeil thought Roell was representing Travel Lodge. The “Offer to Lease” is similar in import to an offer a prospective purchaser would make to buy real estate from an owner. In this document the Travel Lodge (if signed) makes an offer, but it is not binding on any body until it is signed by Travel Lodge. Travel Lodge never signed it. In fact we doubt if Travel Lodge ever saw it. If it did see the offer, there was ample justification not to sign it. The offer fixes no time in which to construct the motel nor does it contain several other protective provisions a tenant of a four hundred thousand dollar structure would be expected to require.
The words in the “Agreement to Pay” that McNeil will owe Roell $10,000.00 when the “Offer to Lease” is signed can mean nothing more nor less than that the $10,000.00 will be due when the offer to lease is signed by both parties. Waldhauser v. Adams Hats, Inc., 207 La. 56, 20 So.2d 423 (426); Blythe v. Hall, 169 La. 1120, 126 So. 679.
The provision in the “Agreement to Pay” that the $10,000.00 will be due when the “Offer to Lease” is signed could refer to the signing of Travel Lodge as well as to the signing of McNeil. In law the words “is signed” refer to the signing of both parties to make the agreement a contract. It seems anomalous that Roell could expect that the $10,000.00 would be due him immediately upon it being signed by McNeil, without regard to whether there is in existence a signed offer for McNeil to accept. Our deduction is that Roell knew full well that he was not then due any money. His answer makes only a general denial of plaintiffs’ petition and his failure to reconvene for the additional $5,000.00 to bring the payment up to the full $10,000.00 is in itself an indication to us that he knew he was not entitled to it.
The “Agreement to Pay” provides that McNeil will pay Roell the money specified for services rendered. A reasonable businesslike construction must be applied to the language of the agreement to determine *547 the intention of the parties. It is clear that the maturity of the payment does not arrive until the offer to lease is executed by all parties to it and that the term “for services rendered” refers to services, past, present and future, which bring about the consummation of the agreement by all parties signing it. Any other construction would not be reasonable nor sensible. Up to August 3, 1964, McNeil had never employed Roell to do anything. The document is worthless until it is signed by all parties. Nothing is earned until something is accomplished.
For these reasons the judgment appealed from is affirmed, with costs to be paid by plaintiff-appellant.
Affirmed.